IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

|  |  |  |
|---|---|---|
| In Matter of the Welfare of C.J.J.I. | ) ) ) ) ) ) ) | No. 39593-6-III Cons. with No. 39594-4-III, No. 39595-2-III  UNPUBLISHED OPINION |

FEARING, J. — The mother of three children, two of whom are Native American, appeals from a juvenile court order declaring her children dependent and from a disposition order continuing the placement of the children outside her home. She clutches Washington Supreme Court decisional language that imposes on the juvenile court, in accordance with the Washington Indian Child Welfare Act (WICWA), the duty of assessing active efforts at every dependency hearing. Based on this principle, she assigns error to the juvenile court's failure to find active efforts during the dependency hearing that preceded the disposition hearing. In response, the State contends that the juvenile court needed to address active efforts only at a hearing in which the State sought out-of-home placement. According to the State, the mother's children were already placed elsewhere, at the time of the dependency fact-finding hearing, and the juvenile court addressed their continued placement only later during the disposition hearing. At

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

the dependency hearing, the juvenile court found Department of Children, Youth and Families (DCYF) exerted active efforts to reunite the family.

We rule, based on RCW 13.38.040(1)(a)(ii) and *In re Dependency of G.J.A.*, 197 Wn.2d 868, 875, 489 P.3d 631 (2021), that the dependency court must review and find active efforts during every hearing, in which the State seeks to place the Indian child out of the home. As a result, the trial court erred when not finding active efforts at the dependency hearing. This lack of review poses particular problems in this appeal because of the significant delay between the dependency hearing and the disposition hearing.

FACTS

This appeal concerns the dependency of the mother's three children, daughter C.V.I., age 13, son C.J.J.I., age 8, and son R.R., age 5. The ages listed are the ages of each child in September 2022 when the State filed the dependency petition. The father of C.V.I. and C.J.J.I. is B.I., a Native American. The father of R.R. is also R.R., not Native American. Neither father has participated in the care of their respective children or responded to the dependency proceeding. We procure most of the substantive facts from testimony at the dependency fact-finding hearing.

C.J.J.I. is an enrolled member of, and C.V.I. is eligible for enrollment in, the Cheyenne River Sioux Tribe through their father, who is a member. Thus, the two oldest

2

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

children are Indian children within the meaning of Indian Child Welfare Act (ICWA) chapter 13.38 RCW and WICWA.

This appeal arises from a dependency action for all three children filed in 2022. DCYF administered an earlier dependency action for C.V.I., C.J.J.I., and R.R. from 2017 to 2021. We begin the facts on the return of the three children to the mother in 2021.

Jessica Richter, a program manager for the substance use disorder program at the Spokane Addiction Recovery Center (SPARC), spoke with the oldest child, C.V.I., soon after the children's return home in 2021. C.V.I. mentioned the mother's drug use but provided no specific information on the use. On a later day, C.V.I. disclosed to Richter that her mother used methamphetamine, and she had seen methamphetamine in her mother's bedside drawer.

In March 2022, Child Protection Services (CPS) opened a new intake file for the mother's family. The reporting party related that the mother ingested methamphetamine and the children had access to the drug. The mother had directed C.V.I. to move a bong into the bedroom so that visitors would not espy the device. Cassidy Rose, the DCYF social worker assigned to the file, requested that the mother provide a urinalysis (UA). Rose listed services available to assist mother. The mother completed the UA testing, but declined any further assistance from DCYF. The mother abhorred the government's harassment of her and her family.

3

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

Jessica Richter, the substance use disorder program manager at SPARC, testified at the dependency hearing about the mother's substance use. Richter averred that the mother failed to disclose cocaine use in March 2022 during a substance abuse evaluation.

In mid-April 2022, CPS received another referral concerning supervision of middle child, C.J.J.I. C.J.J.I., while unsupervised in the apartment complex where the family lived, exposed himself to another child. CPS received five additional reports of concerns for the children in May 2022. These intakes alleged that the mother physically assaulted C.V.I., that C.V.I. performed most of the care and supervision of her younger siblings, and that C.V.I. reported to her school counselor the presence of illicit substances in the home. At that time, DCYF concluded that insufficient evidence supported each report.

During the later dependency fact-finding trial in November 2022, Janet McDonald, a Greenacres Middle School counselor, testified to events in May 2022. C.V.I. attended Greenacres Middle School. According to McDonald, C.V.I. reported that she supervised her brothers when her mom socialized with her boyfriend, Shawn Nason, and C.V.I. commented that Nason carries a gun, which rendered her uncomfortable. In response to C.V.I.'s allegations, the mother blamed C.V.I. for R.R. running away unsupervised from a park. The mother also claimed that C.V.I. attempted to fist fight her.

4

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

DCYF social worker Cassidy Rose testified at the dependency hearing to interviewing C.V.I. on May 17, 2022 about the purported altercation between the mother and C.V.I. C.V.I. disclosed she visited a park with her boyfriend. Her mother had tasked her to supervise youngest child, R.R., and he had run home unsupervised. According to C.V.I., when she returned home, her upset mother punched her throughout her body. C.V.I. stated the punching was strong enough to cause bruises, but Rose did not see any bruises. During the May 17 interview, C.V.I. also added that she saw her mother strike R.R., which caused a mark on his leg.

C.J.J.I. attended Greenacres Elementary School, not to be confused with the nearby Greenacres Middle School. A May 24 report prepared by DCYF from information supplied by Greenacres Elementary School recorded that C.J.J.I. mentioned drinking alcohol to fall asleep. The report gave no date for the incident.

On May 26, 2022, the mother did not answer the phone when Greenacres Elementary School personnel called her to retrieve C.J.J.I. from school. C.J.J.I. needed transportation home because of his banishment from the school bus due to poor behavior. At 5:30 p.m., on May 26, the mother and a friend arrived at the school after the friend found the mother at Shawn Nason's home. On the mother's arrival at the school, the elementary school Principal Lindsey Kent observed the mother looking disheveled with

marks on her arm that she stated resulted from being at the hospital. According to Kent, the mother' speech was difficult to follow.

A June 2 DCYF report repeated other information supplied by Greenacres Elementary School. According to the report, C.J.J.I. told school staff that his mother had not spent the last two nights at home and he stayed elsewhere during those nights. C.J.J.I. added that he failed to take his morning medication in the absence of his mother. He arrived at school hungry because of the lack of dinner the night prior. The report further declared that C.J.J.I. took school lunches home for his dinner.

A June 3, 2022, report read that C.J.J.I. disclosed that the doors to his house were locked when he arrived home the previous afternoon. He stayed overnight with another family in the apartment complex, but ate no dinner. According to school officials, C.J.J.I. could not recall the last time he saw his mom.

To address the mother' struggles with supervision of her children, DCYF contacted child care providers near the family's home, including Vanessa Behan Crisis Nursery. DCYF also asked school counselors about after school programs. DCYF helped enroll the children in daycare at the MLK Community Center. DCYF connected the mother with an organization that paid for the costs associated with the daycare. Nevertheless, the children attended daycare for only five days. Social workers

unsuccessfully attempted to contact the mother about the children's absence from daycare by sending text messages, calling her phone, and visiting her house.

On September 16, 2022, DCYF removed C.J.J.I. and R.R from home. DCYF took custody of C.J.J.I. from Greenacres Elementary School at the end of the school day. School Principal Lindsey Kent observed the apprehension. According to Kent, C.J.J.I. understood the nature of DCYF's action and became upset. As social workers escorted C.J.J.I. to a van, the mother arrived at the school. The mother approached C.J.J.I. and uttered: "You good bro? You good? We talked about this." Report of Proceedings (RP) at 148.

Social worker Cassidy Rose avowed, at the dependency fact-finding hearing, that the mother, at an earlier shelter care hearing, denied use of controlled substances. Later, at that shelter care hearing, when asked by the juvenile court as to what a hair follicle test would show, the mother replied that it would test positive for cocaine.

During a September 29 meeting between the mother and Angela Van Grimbergen, an employee for the Institute for Family Development, the mother expressed frustration with DCYF. The mother told Van Grimbergen she was not using drugs and DCYF unfairly targeted her because of her history. The mother later changed her story and disclosed she had recently used cocaine, but insisted that her ingestion of the drug should

not concern anyone.  On September 29, C.V.I. disclosed to DCYF social service specialist Matteah Keller the former's concern about her mother's drug use.

Jessica Richter testified to the results of the mother's UA testing collected on October 4, 2022.  The test results confirmed use of amphetamine and methamphetamine. The mother tested positive for fentanyl in a November 22, 2022 UA test.

During the fact-finding hearing, the mother testified about her substance use:

> Q. You've seen the results of a recent drug test that indicates a positive for fentanyl?
> A. Yes, I did.
> Q. Can you explain that?
> A. Honestly, I have, like, I'm shocked—just as shocked.  That's why I asked to go get a hair follicle test to show that I don't know where in the life of me that came from.
> Q. So have you ever used fentanyl?
> A. Never in my entire life.
> Q. In the last seven or eight months since March 29th, have you used marijuana?
> A. Yes.
> Q. When is the most recent time?
> A. In March before it all—did you say the 29th?  Well, it'd be before that.
> Q. Have you used cocaine?
> A. Before March 29th, yes.
> Q. So not since March 19th?
> A. No.
> Q. Have you used methamphetamine?
> A. September 30th, but I guess it would—between 11/25 and 2/15, so it'd be considered the 1st of October also.
>  . . . .
> Q. So if you used methamphetamine, you consider that to be a slip?
> A. Yeah, because I haven't abandoned my treatment.

8

Q. So if you used—how many times would you have to use meth in order for you to consider it something other than a slip?

A. If we look up the definition online of a slip and a relapse, it was a slip. I have not abandoned or dis—I haven't abandoned my—my recovery. I haven't consistently used in meth. It was a one-time use of methamphetamine, because that is my drug of choice. It's a slip. Like, my sobriety does mean tremendously to me. Neither the State wants to believe it, whoever doesn't want to believe it. My last—I'm proud cause when I put myself into treatment the last time, October 19th, 2019, I actually have been fully, like, clean of using methamphetamine. Like, I have not once injected it. I was an IV user. I have not snorted it, ever smoked it. I have not done any use of methamphetamine since that one slip on September 30th, when my kids were removed. But prior to that, I have not once had any kind of slip or any desire to use.

RP at 499-500, 526.

At the fact-finding hearing, social worker Jessica Richter of SPARC testified to multiple unsuccessful and some successful attempts to contact mother. On one occasion, Richter contacted the mother and handed her a packet containing a list of community resources to assist her, but the mother declined to take possession of the packet. Richter discussed in-home parenting services with the mother. The mother sometimes responded to offers of assistance: "'I don't need the Department. I won't be involved. This is harassment.'" RP at 350.

Mattie Keller, the DCYF social service specialist, averred:

Q. Have you talked to her about engaging in mental health services?
A. Yes.
Q. Can you describe those conversations?
A. Yes. I have brought it up multiple times, asked her if I can assist her, informed her she had an appointment with Phoenix Counseling

9

Services that was scheduled by the Department. And she went to that, but declined to sign the ROIs [Releases of Information] and so they ended the intake appointment. They had called us a few weeks later and said that there was still an opening if she would like to come back in. When I mentioned that to her—to Ms. Mother—she stated that she is comfortable at the YWCA and does not want to go anywhere else. I informed her that I have spoken with the YWCA and they state that she is on a waitlist and I really encouraged her to get start engaging immediately.

Q. *So the Department made a [sic] appointment for her at Phoenix; is that what you said?*

A. *Mm-hmm. Yes.*

Q. *What was her response to that proactive step?*

A. *She said that she—Ms. Mother stated she did not want our help in scheduling appointments and to not do that.*

Q. *Is that something you've tried to respect since that time?*

A. *Yes.*

Q. *Why?*

A. *I do not want to put her into a situation where she's not comfortable. If she states she's not comfortable at an agency, I don't want to push that on her.*

Q. *When she states she doesn't want the Department scheduling appointments for her, that's something that you wouldn't continue to push either?*

A. *Correct.*

RP at 398-99 (emphasis added).

Robin Haskell, the Cheyenne River Sioux Qualified Expert Witness (QEW),

testified at the dependency fact-finding hearing. Haskell declared:

Q. What is your opinion, if any, regarding the provision of active efforts to this family between the end of March of 2022, and the middle of September of 2022?

A. I wasn't here during March, but I don't—I think the only reports we have received—or I don't think we have received anything until I started, *so there really hasn't been much active efforts*. I think [DCYF social worker] Cassidy [Rose] did contact someone and they told her that,

10

you know, I think we already talked about this. Where we couldn't do anything unless a petition was filed. But I was here. I didn't really receive anything until I started requesting it, I guess.

RP at 489 (emphasis added).

PROCEDURE

On September 16, 2022, DCYF filed the pending dependency petitions for C.J.J.I. and R.R. DCYF alleged the children lack a capable parent because of the mother's substance use, mental health, exposing the children to unsafe individuals, domestic violence between the mother and her boyfriend Jeffrey Shawn Nason, and the mother's failure to adequately supervise her children. DCYF took the two younger children in custody the same day.

At a September 20, 2022 shelter care hearing, the juvenile court ordered that C.J.J.I. and R.R. be returned home to the mother. The mother agreed to participate in a chemical dependency assessment and any recommended treatment, random UA testing, medication management, mental health treatment, and domestic violence prevention services. The mother signed releases for information.

On September 21, 2022, DCYF filed a dependency petition for the oldest child, C.V.I. DCYF did not then take custody of C.V.I. At some unidentified date, either before or after September 21, C.V.I. began staying overnight with a friend. The juvenile court conjoined all three dependency actions.

On September 29, the mother hit C.J.J.I. with a fist.  The mother and son sat on a couch and argued with one another.  Mother cautioned C.J.J.I.:

> "If you don't shut the fuck up, I'll beat the shit out of you."

RP at 380-81.  The mother then struck her son multiple times.  The blows left no bruises on the son's body.

On September 30, 2022, DCYF, with dependency petitions previously filed for all three children, filed an emergency motion to place all three children in out-of-home care.  A declaration from DCYF social worker Beth Willey accompanied the motion.  In response to the motion, the juvenile court conducted a hearing on the afternoon of September 30.  The clerk's papers and the resultant order do not label the hearing as a shelter care hearing, but rather an emergency dependency hearing on a motion to remove children from the home.  The courtroom minutes show that the juvenile court entertained argument of counsel, but they do not show whether the court heard testimony from witnesses.  The juvenile court granted the emergency motion and ordered all three children removed from the mother's home.  To repeat, C.V.I. already lived elsewhere.

On September 30, 2022, the juvenile court signed an order for removal from the mother's home.  The order's findings declared in part:

> A manifest danger exists that the child[ren] will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44.063 would not protect the child[ren] from danger.

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

> There is reason to know the child[ren] [are] . . . Indian child[ren] as
> defined in RCW 13.38.040 and 25 U.S.C. § 1903(4). The child[ren] [are]
> in need of out of home placement to *prevent imminent physical damage or
> harm to the child*.
> . . . .
> *Reasonable and active efforts* have been made by DCYF to prevent
> or eliminate the need for removal of the child from the child's home and
> have been unsuccessful. The Department's active efforts as articulated in
> the Department's declaration and other filings are incorporated herein.
> There [sic] efforts have been unsuccessful.

Clerk's Papers (CP) at 232 (emphasis added).

Two months later, on November 29 and 30 and on December 6, 2022, the juvenile

court conducted a dependency fact-finding hearing.

When ICWA or WICWA applies to a child, DCYF must show it exerted active

efforts to prevent a breakup of the family and to return the Native American children to

their parents. At the dependency hearing, the mother argued that DCYF had not engaged

in the active efforts. During the fact-finding trial, the mother's counsel asked Jessica

Richter, of SPARC, regarding DCYF's active efforts to keep the mother and her children

together. The questioning elicited an objection from the State's counsel:

> Q. So what active efforts have been taken since March 29th?
> MS. CULVER [State's attorney]: Objection, Your Honor. I believe
> he's attempting to elicit testimony, which at this point would be relevant to
> dispositional issue. Active efforts are relevant with respect to placement.
> MR. HENRY [Mother's attorney]: On the recent—may I respond?
> THE COURT: Yeah, go ahead.
> MR. HENRY: On the recent, I think it's [In re Dependency of]
> *J.M.W.* [199 Wn.2d 387, 844, 514 P.3d 186 (2022)] case, Your Honor,
> there needs to be a showing of active efforts before removal. I don't think

13

that it's strictly a dispositional issue. It's both dispositional and Fact Finding.

> THE COURT: I tend to agree with that assessment, that it's both. And I would make findings, if I need to, about a case that comes after the time period we're talking about and how it applies at this point. So the question's allowed.
>
> You can answer what you think you've—the active efforts that you've done.

RP at 349. Richter then testified to the mother' resistance to assistance.

After Indian expert Robin Haskell broached the subject of active efforts during her testimony at the fact-finding hearing, the mother's counsel focused on active efforts, which elicited another objection from the State's attorney. This time, however, the juvenile court sustained the objection.

> Q. Well, between March 29th of this year and September 13th of this year, do you feel that the Department has provided active efforts to prevent the break up—
> MS. CULVER: Objection.
> Q. —of the Indian family?
> THE COURT: What's the objection?
> MS. CULVER: It's getting into a dispositional issue, Your Honor.
> MR. HENRY: We feel it's part of Fact Finding in regards to the recent J.M.W. case, Your Honor, that there has to be a showing that there's been active efforts. Once the Department has a reason to know that this may be an Indian family, there needs to be a showing of active efforts prior to removal.
> THE COURT: Doesn't that go to disposition then?
> MR. HENRY: I feel it goes to [dependency] Fact Finding, Your Honor.
> THE COURT: But whether or not the children are dependent children?
> MR. HENRY: The children are—there has been a showing, I believe, from the Department that the children are Indian children.

THE COURT: Correct.

MR. HENRY: The Department has testified through Ms. Rose that she was aware on March 29th of this year that the children were probably Indian children. She certainly had a reason to know on that date and I believe it would be our opinion that the recent *J.M.W.* case would indicate that there needs to be a provision of active efforts, which is a Fact Finding issue prior to actual removal of the children, which did not take place until September.

THE COURT: Okay. The objection is sustained. The active efforts goes to whether or not the children will be placed in out-of-home care, not whether or not they are dependent. And this Court isn't going to hear an opinion from Ms. Haskell about active efforts without more foundation, which can be done at the disposition, if needed.

Because if there's no Fact Finding, the case is doing dismissed and the children go home. This active-efforts piece is whether or not, if the Court does find the children dependent, where will they be placed? And that's—you can definitely call Ms. Haskell again and ask her these same questions, but lay some foundation of what her opinion would be based on.

MR. HENRY: Thank you, Your Honor.

Q. Ms. Haskell, as of the date of September 13th, when the children—well, a day or two after September 13th, perhaps the 15th, when the children were physically removed from the mother, is it your opinion that there was a difficulty or a possibility or a probability of imminent, physical damage or harm to the children if they were not removed?

MS. CULVER: Objection.

THE COURT: What's the objection?

MR. HENRY: Same ruling?

THE COURT: I don't know what—

MS. CULVER: Again, Your Honor—again, Your Honor, it goes to a dispositional issue is he's specifically talking about something that is with respect to placement—out-of-home placement and that is not at issue here.

THE COURT: That objection is sustained. Same issue. This isn't a precluded issue. It can be used at disposition, if needed. Again, if the Court finds that the children not dependent, there won't be a disposition. There won't be testimony on this piece. If the Court does find the children dependent, there will be a disposition and there will be testimony on this piece.

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

RP at 489-92.

Next the mother's counsel asked Robin Haskell about the possibility of imminent physical damage or harm to the children when removed in September. The State's counsel objected on relevance grounds, and the court sustained the objection.

On December 13, 2022, the court issued an oral ruling granting the State's request for a dependency for all three children. The juvenile court made no mention then of active efforts by DCYF to prevent the family breakup.

On January 27, 2023, the juvenile court entered an order confirming its oral ruling. At the beginning of the written order, the juvenile court wrote:

> The evaluation and finding of whether the Department has made active efforts to prevent the breakup of the Indian family is a dispositional issue and not a required finding to establish dependency.

CP at 972.

The dependency order included findings of fact, based on testimony at the dependency hearing, which we quote in part. More findings of fact are quoted in Appendix A.

> 2. The children are dependent as to the mother, …, pursuant to RCW 13.34.030(6), because they have no parent, guardian, or custodian capable of adequately caring for them, such that they are in circumstances which constitute a *danger of substantial damage to their psychological or physical development*.
> 3. Ms. [Mother]'s barriers to being a safe parent include unresolved substance abuse issues, unresolved mental health problems, parenting deficiencies including inappropriate supervision, and domestic violence

16

issues, all of which are impacting her ability to safely parent and demonstrate an inability to meet her children's physical and emotional needs as set forth in the facts below.

. . . .

11. Ms. [Mother] believes she is being targeted and that the concerns underlying the Department's petitions are not valid. Ms. [Mother] lacks insight into the significance of her mental health issues that lead to her inability to safely parent. Ms. [Mother] lacks insight into how her choices harm her children.

. . . .

46. Before the dependency petition was filed, Ms. [Mother] had the legal right to refuse to participate in any of the recommended services offered by DCYF. It was her right to refuse to sign Releases of Information (ROIs). It was her right to refuse to allow social workers into her home or to speak to her children. Exercising these rights is the choice she made. That choice showed her lack of insight into the need for her skills as a parent to increase.

. . . .

92. Ms. Van Grimbergen worked with [the mother] to try to get her into services. [The mother] *was resistant to scheduling a mental health assessment, indicating she wanted to do that service through SPARC, and needed to finish the chemical dependency assessment first.*

. . . .

96. [The mother] contacted social worker Keller about the Department sharing information with SPARC. [The mother] yelled at Ms. Keller, expressing frustration about the Department sharing information about [the mother's] cocaine use with SPARC. [The mother] did not disclose her use of methamphetamine to Ms. Keller.

. . . .

99. [The mother] disregarded the court's order to sign releases of information. [The mother] testified she did this because she was afraid the released information would be used against her. [The mother's] choice in this respect reflects her prioritization and protection of herself above all else and her unwillingness to adhere to the court's order designed to keep her children safe.

. . . .

114. [The mother] has continued to be resistant to the Department's efforts to engage her in services and problem solve [sic] barriers to her

engagement.  For instance, while [the mother] has complained about service locations, some of the services are available virtually.  [The mother] has continued to state she does not need the services and the Department's involvement with her family is ridiculous.

115. Social worker Keller has had extensive contact with [the mother] and described the volatility [the mother] can display, frequently yelling at Ms. Keller, including an instance when [the mother] followed Ms. Keller to her car after Ms. Keller had travelled to [the mother's] home to bring her a gas card.  [The mother's] inability to regulate her emotions is a barrier to her making progress with the challenges *she faces and creates circumstances which constitute a danger of substantial damage to her children's psychological and physical development.*

. . . .

131. [The mother] does not currently possess the skills to adequately or safety parent [R.R.], [C.J.J.I.], and [C.V.I.].  *[The mother] is not willing or able to acknowledge the need to immediately engage in services to address these barriers, including with respect to her mental health and substance abuse.*

CP at 973-88 (emphasis added).

The juvenile court conducted a disposition hearing on January 27, 2023.  In advance of the hearing, Robin Haskell, the Tribe's QEW, submitted a written declaration that read in part:

The Department has worked with this family extensively over the years.  The Department was involved by court order through a four year dependency, in which the Tribe was also involved.  After the last dependency was dismissed it was just a few months until the Department started receiving reports about [the mother]' parenting that posed a safety risk to her children.  The Department again attempted to work with [the mother] short of court involvement for several months, but [the mother] would not acknowledge that she needed help.  As the concerns continued to mount, the Department took the necessary step of pursuing another dependency for the safety and welfare of the children.  Since the petitions were filed, the Department has continued to be actively involved with this

> family trying to engage [the mother] to participate in the case plan, supporting the needs of the children, and actively engaging the Tribe through updates, inclusion, and case planning. *It is my opinion that the Department has made active efforts to offer and provide remedial services and rehabilitative programs to this family to keep them together, but those efforts have so far proved unsuccessful*

CP at 956-57 (emphasis added). Haskell's declaration did not list any of the purported active efforts.

During the disposition hearing, the mother objected to the delays in the proceedings. The mother highlighted that the dependency fact-finding hearing occurred 74 days after removal and was broken up into many days. The disposition hearing occurred on January 27, 2023, 135 days after removal.

Also, during the disposition hearing, the mother contended that DCYF had failed to exert active efforts. She emphasized that DCYF did not offer mental health services, domestic violence services, or transportation services despite the mother's car sometimes being inoperable. DCYF did not offer assistance with housing despite the mother occasionally reporting difficulty with management at Catholic Charities and with other tenants bothering her and her family.

At the disposition hearing, Robin Haskell testified contrary to her testimony in her declaration regarding DCYF's active efforts:

> Q. *Are you able to state that the Department provided active efforts to prevent the break up of the Indian family between March 29th of 2022, and September 16th of 2022?*

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

*A. It hasn't been carried out the way I would have wanted it to. All I know is that they did the best they could with the situation to my knowledge.*

Q. What do you mean by "the best that they could?"

A. I think they did have a family search and tried to contact people. I don't think their efforts were very successful because there wasn't anyone that they could (unintelligible)—excuse me—with contact to have a placement for the children. They placed the children in the—they placed them with the best option that was available.

Q. Well, that was in September of 2022, is that right, the placement was made?

A. Yes.

. . . .

Q. *Can you speak at all to what efforts the Department made to prevent the break up of the family before September 16th of 2022?*

A. *I don't think so.*

Q. So when you say you don't think so, you don't think that they made any or you don't think that you can speak to that issue?

A. I—I—um, let me think. Hmm, I think that they might have—I don't know. I don't—I can't remember exactly. You said September 16th? Before that?

Q. Before the children were first removed in September.

A. I can't recall anything about—about that. I mean, as far as I know they did. But given the circumstances, they were put in a position where, I mean, there's nobody there. Nobody available for the kids to be placed there—different home, like relatives, as far as I know. I am not too sure about that.

RP at 571-73 (emphasis added).

In her oral ruling after the disposition hearing, the juvenile court commented:

I want to address the valid objection that the mother argues today about how long it takes to have this resolved. That's—it's unacceptable. I mean, I don't know how to explain to her the efforts made, the number of families who didn't get hearings and still it took that long in those small increments. And she doesn't have to accept my explanation because it's an unacceptable explanation.

20

RP at 606.

At the conclusion of the disposition hearing, the juvenile court ruled that the

children would remain outside the home during the dependency. On February 21, 2023,

the court entered the following findings, in part:

> P. The court finds the children were harmed while in [the mother's] care, including by enduring chronic stress which has physical impacts, demonstrating sexualized and other high risk behaviors, and emotional damage, which has long lasting impacts. This harm <u>was</u> due to [the mother's] actions and choices <u>as</u> impacted by her mental health, substance use, domestic violence and exposure to unsafe individuals, instability and inability to control her behavior, and inability or unwillingness to provide her children with appropriate supervision. *As these issues have not been mitigated, the children continue to be at imminent risk of physical damage or harm in [the mother's] care.*
> Q. The children *are at imminent risk of physical damage or harm and substantial and immediate danger or threat of such danger should they be returned to [the mother]'s care.*
> . . . .
> T. The facts establish by clear, cogent, and convincing evidence, including testimony of a qualified expert witness (QEW), that continued custody by the parent is likely to result in serious emotional or physical harm to the children.
> a. Robin Haskell is the tribal representative for these matters and the tribe's designated QEW. The court is satisfied that Ms. Haskell meets the statutory definition of ICWA QEW.
> b. *Ms. Haskell testified and submitted a sworn declaration for the record in which she expressed the opinions that the DCYF has made active efforts to offer and provide remedial services and rehabilitative programs to this family to keep them together, but those efforts have so far proved unsuccessful, and that continued custody of the children by the parents would likely result in serious physical or emotional damage to the children.*

21

c. Ms. Haskell supports out of home placement for the children. She further supports placement in foster care as there are currently no willing appropriate and available relative placements.

. . . .

U. *DCYF made active efforts by attempting to work with* [*the mother*], *both before and after filing the dependency petition, to engage her in remedial services and rehabilitative programs to prevent the breakup of the Indian family beyond simply providing referrals to such services, but those efforts have been unsuccessful.*

V. [The mother] was previously involved in a four-year dependency, was dismissed in December 2021. DCYF again became involved with the family in March 2022, when it began receiving new reports concerning [the mother's] ability to safely parent. DCYF continued to attempt to engage [the mother] between March and September 2022, when [the mother] persisted in declining services and stated she did not need DCYF assistance. [The mother] had the right at that point to decline, but DCYF continued to try to work with [the mother]. *The court finds DCYF made active efforts to prevent the breakup of the family* prior to the filing of the dependency petition, as further detailed in the testimony of SW Cassidy Rose during the dependency trial and in her sworn declaration filed in support of this hearing, incorporated by reference as findings of fact. *These active efforts include but are not limited to the following*

[See Appendix B for the detailed findings].

W. DCYF has *continued to make active efforts* since the filing of the petition in September 2022 and subsequent removals of [the mother's] children from her care. [The mother] has continued to be resistant to the Department's unrelenting efforts and attempts to engage her, including when services were court ordered. These efforts were detailed in the testimony of SW Mattie Keller during the dependency trial and in her sworn declaration filed in support of this hearing, incorporated by reference as findings of fact. These active efforts include but are not limited to the following:

[See Appendix B]

. . . .

Y. *Active and reasonable efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and eliminate the need for removal of the children from the children's home.* The specific preventive services offered

22

or provided are outlined in the Dependency Petitions, trial testimony, and declarations and are incorporated by reference. *These efforts have been unsuccessful.*

CP at 1312-13, 1318 (underlining in original) (emphasis added).

LAW AND ANALYSIS

Active Efforts

On appeal, the mother contends that the juvenile court, at every hearing, needed to find that DCYF exerted "active efforts" to prevent the breakup of her family. The mother also contends the court erred when finding a manifest danger of serious abuse or neglect if the children are returned home. Finally, the mother assigns error to numerous predicate findings of fact in the disposition and dependency orders.

Despite first broadly asserting that the juvenile court failed to enter a finding of active efforts at every hearing during the dependency proceeding, the mother focuses on a failure to enter a finding at the completion of the dependency hearing. The State agrees that the juvenile court did not find, at the dependency hearing, that DCYF engaged in active efforts. According to the State, the court need not have entered a finding then because the court did not decide placement at the time of adjudging dependency. As the argument continues, active efforts became relevant only during the disposition hearing. We agree with the mother.

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

The federal Indian Child Welfare Act and a state analog act, the Washington Indian Child Welfare Act, created the concept of "active efforts." Our opinion does not focus on the nature of active efforts, but rather at what hearings must the juvenile court find DCYF exercised active efforts.

The United States Congress enacted ICWA in 1978 because of the disproportionately high rate of forced removal of Native American children from their traditional homes and their Native American cultures. Genocide by violence and disease did not suffice. European Americans also insisted on cultural genocide by stealing Native American children. Before enactment of ICWA, states forcibly removed as many as 35 percent of all Indian children, mostly from intact American Indian families with extended family networks, and placed them in predominantly non-Indian homes, which had no relation to American Indian cultures. 25 U.S.C. § 1901(4); Troy R. Johnson, *The State and the American Indian: Who Gets the Indian Child?*, 14 WICAZO SA REV. 197, 208 (1999). The per capita rate of Indian children in foster care was fifteen times higher than the rate for non-Indians. 25 U.S.C. § 1901(4); H.R. REP. NO. 95-1386, at 9 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7531. The removal demonstrated a lack of understanding by child welfare workers of the role of extended families in tribal culture and threatened tribal survival by removing children at such a high rate. The process damaged the emotional lives of Native American children, who lost touch with their

24

people and culture. RED POWER: THE AMERICAN INDIANS' FIGHT FOR FREEDOM 124 (Alvin M. Josephy Jr. et al. eds., 2d ed. 1999).

Congress deemed the interests of tribal stability as important as the best interests of the child. RED POWER, *supra*, at 124. Congress also concluded that the best interests of Native American children did not necessarily echo the best interests of non-Native American children, since the former traditionally enjoy larger extended families and tribal relationships in their culture. B.J. JONES, MARK TILDEN & KELLY GAINES-STONER, THE INDIAN CHILD WELFARE ACT HANDBOOK: A LEGAL GUIDE TO THE CUSTODY AND ADOPTION OF NATIVE AMERICAN CHILDREN 12-13 (2d ed. 2008).

After adoption by the United States Congress of ICWA, the Washington State Legislature passed its own version of the act. Both the federal act and the state act overlap in their provisions. Washington courts interpret the acts as analogous and conterminous unless one provides greater protection, in which case the more protective act will supplant the less protective act. 25 U.S.C. § 1921; *In re Dependency of J.M.W.*, 199 Wn.2d 837, 844, 514 P.3d 186 (2022); *In re Adoption of T.A.W.*, 186 Wn.2d 828, 844, 383 P.3d 492 (2016).

When Indian children are the subjects of a proceeding, ICWA and WICWA impose more exacting requirements on DCYF than in other cases. *In re Adoption of T.A.W.*, 186 Wn.2d 828, 841 (2016). Important here, ICWA and WICWA require the

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

Department to engage the parent in active efforts at family preservation. 25 U.S.C. §
1912(d); RCW 13.38.130(1); *In re Dependency of J.M.W.*, 199 Wn.2d 837, 840 (2022);
*In re Dependency of G.J.A.*, 197 Wn.2d 868, 875 (2021). In a non-WICWA setting,
DCYF need only exert reasonable efforts. The active efforts requirement benefits not
only the Indian family, but also implicates the tribe's rights. *In re Dependency of G.J.A.*,
197 Wn.2d 868, 909 (2021). Active efforts protect "the rights of tribes to continue to
exist and protect the next generation." *In re Dependency of G.J.A.*, 197 Wn.2d 868, 909
(2021).

We quote sections of ICWA and WICWA which help to identify the hearings at
which the State must establish its exertion of active efforts to prevent a family breakup.
25 U.S.C. § 1912(d), a portion of ICWA, pronounces:

> Remedial services and rehabilitative programs; preventive measures.
> *Any party seeking to effect [sic] a foster care placement* of, or termination
> of parental rights to, an Indian child under State *law shall satisfy the court
> that active efforts have been made to provide remedial services and
> rehabilitative programs designed to prevent the breakup of the Indian
> family and that these efforts have proved unsuccessful.*

(Emphasis added) (boldface omitted). 25 U.S.C. § 1903(1) defines "foster care
placement:"

> "foster care placement" which shall mean any action removing an
> Indian child from its parent or Indian custodian for temporary placement in
> a foster home or institution or the home of a guardian or conservator where
> the parent or Indian custodian cannot have the child returned upon demand,
> but where parental rights have not been terminated;

26

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

RCW 13.38.130(e) and RCW 13.38.040(3), critical fragments of WICWA, mirror the

ICWA provisions.  The former reads:

> (1) A party seeking to *effect [sic] an involuntary foster care placement* of or the involuntary termination of parental rights to an Indian child shall *satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful*.

(Emphasis added.)  The latter statute declares:

> (a) "Foster care placement" which means *any action removing an Indian child from his or her parent* or Indian custodian for temporary placement in a foster home, institution, or with a relative, guardian, conservator, or suitable other person where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated.

(Emphasis added.)  WICWA adds a section not found in ICWA.  RCW 13.38.040(1)(a)

reads:

> (ii) In any dependency proceeding under chapter 13.34 RCW, in which the petitioner is *seeking the continued out-of-home placement* of an Indian child, the department or supervising agency must show to the court that it has *actively worked* with the parent, parents, or Indian custodian in accordance with existing court orders and the individual service plan to engage them in remedial services and rehabilitative programs to prevent the breakup of the family beyond simply providing referrals to such services.

(Emphasis added.)  Thus, under WICWA, the State must show "active" work, if not

active efforts, not only when it seeks to remove the children from home, but also in any

proceeding in which it seeks to continue out-of-home placement.

27

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

To reiterate, RCW 13.38.130(e) demands that DCYF show it employed active efforts to prevent a family breakup before any "involuntary foster care placement." RCW 13.38.040(3)(a) defines a "foster care placement" as "any action removing an Indian child from his or her parent." Based on a reading of the two statutes, the State argues that the law does not demand a finding of active efforts at every hearing during the dependency process. According to the State, ICWA and WICWA's active efforts requirement is triggered by the type of placement sought, rather than the type of hearing held. In so arguing, the State does not recognize that RCW 13.38.040(1)(a)(ii) demands that the State show "active" work with the parent in any dependency proceeding, in which the State seeks "continued out-of-home placement."

The Washington Supreme Court has rejected the State's position, in situations during which a child will remain outside the home, based on the patent terms of RCW 13.38.040(1)(a)(ii). In *re Dependency of G.J.A.*, 197 Wn.2d 868, 875(2021), the high court wrote:

> Among their many requirements, ICWA and WICWA mandate that the State provide "active efforts" to prevent the breakup of Indian families. 25 U.S.C. § 1912(d); RCW 13.38.130. Active efforts must be thorough, timely, consistent, and culturally appropriate. 25 C.F.R. § 23.2; RCW 13.38.040(1)(a). The "active efforts" requirement is distinct from the "reasonable efforts" requirement in non-Indian child custody cases because it requires both a higher level of engagement from the Department and culturally appropriate services. To ensure that the Department meets the minimum requirements of ICWA and WICWA, every dependency court that oversees cases involving Indian families has the responsibility to

28

evaluate the Department's actions. WICWA requires the court to conduct this evaluation at every hearing when the Indian child is placed out of the home, and the BIA recommends this at *every* hearing. RCW 13.38.040(1)(a)(ii); BIA, U.S. DEP'T OF INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 43 (2016) (hereinafter BIA GUIDELINES). If the Department's actions fall below ICWA and WICWA standards, the court must order the Department to do more to comply with its statutorily imposed obligations before the case can proceed to termination.

WICWA, unlike ICWA, requires the dependency court to enter a finding at every hearing when the Indian child resides out of the home.

In *In re Dependency of G.J.A.*, 197 Wn.2d 868 (2021), the juvenile court terminated the mother's rights to all children after finding that DCYF engaged in active efforts. The five children were affiliated with the Blackfeet Nation. DCYF argued that the mother's appeal was moot because the court found the Department made active efforts before and after a five-month time period on which the mother focused. The mother did not challenge the findings of active efforts outside of this five-month window of time. The Supreme Court held that whether DCYF exerted active efforts during other time periods did not dispense of its obligation during the time referenced by the parent. Because DCYF must provide consistent active efforts, the juvenile court must review the Department's actions at every hearing when the child is placed out of the home. A prior finding of active efforts does not alleviate the department's burden at any other point in a dependency.

The State deems *In re Dependency of G.J.A.* friendly because the case involved a finding of active efforts at the termination stage. The Supreme Court, in *Dependency of GJA*, did not limit its ruling to a termination case, or even a disposition hearing.

*In re Dependency of J.M.W.*, 199 Wn.2d 837 (2022), concerned two shelter care hearings that happened shortly after J.M.W. was placed into foster care. The Supreme Court held that the juvenile court must assess whether DCYF engaged in active efforts at the time of the shelter care hearing since such a hearing occurs in the context of a dependency and child custody proceeding under RCW 13.38.040(3) and under the rubric of a foster care placement according to RCW 13.38.040(1)(a) and .040(3)(a). The Supreme Court analyzed RCW 13.38.040 and other sections of WICWA. The court wrote that "child custody proceedings" included foster care placements. RCW 13.38.040(3)(a). "Foster care placement" means "any action removing an Indian child from his or her parent . . . for temporary placement . . . where the parent or Indian custodian cannot have the child returned upon demand." RCW 13.38.040(3)(a).

The Washington Supreme Court, in *In re Dependency of J.M.W.*, further observed that RCW 13.38.040(1)(a) declares that "[a]t a minimum," the department must take timely and diligent efforts as part of its active efforts. Other portions of WICWA insist that active efforts be expended when possible. RCW 13.38.130(1), for example, says:

> A party seeking to effect an involuntary foster care placement of . . .
> an Indian child shall satisfy the court that *active efforts* have been made

30

to . . . prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

(Emphasis added.) Thus, DCYF held the obligation to apply active efforts to the family before removing the child from his home and initiating a dependency. The active efforts included timely and diligent efforts.

In *In re Dependency of J.M.W.*, the juvenile court made a finding of active efforts at the initial shelter care hearing. The court did not make this finding at a later shelter care hearing but, instead, concluded that "'there ha[d] been no change in circumstances since the shelter care hearing on September 27, 2019.'" *In re Dependency of J.M.W.*, 199 Wn.2d 837, 843-44 (2022) (citation omitted). The juvenile court thereby committed error. RCW 13.38.140(2) requires an express finding. Since DCYF had not established it had made active efforts between the time of the initial shelter care hearing and the second shelter care hearing, J.M.W. should have been returned to his parents unless the department had established doing so would have subjected him "to substantial and immediate danger or threat of such danger." RCW 13.38.160.

In *In re Dependency of A.T.*, 29 Wn. App. 2d 687, 541 P.3d 1079 (2024), an appeal from an order of dependency, this court held that the juvenile court erred when finding DCYF engaged in active efforts. Although the juvenile court had also conducted the disposition hearing by the time of the appeal, this court did not suggest that WICWA only required a finding of active efforts at the disposition hearing.

31

Assuming the juvenile court need not assess active efforts at the dependency

hearing, such a rule might assume that the disposition hearing will follow immediately.

RCW 13.34.110(4) prescribes:

> *Immediately* after the entry of the findings of fact, *the court shall
> hold a disposition hearing*, unless there is good cause for continuing the
> matter for up to fourteen days.  If good cause is shown, the case may be
> continued for longer than fourteen days.

(Emphasis added.)

The State also contends that RCW 13.34.130 dictates that the juvenile court not

make any placement decision or active efforts finding before the disposition hearing.  The

opening to RCW 13.34.130, a statute that applies to all dependency proceedings, not just

Indian children proceedings, declares:

> If, after a [dependency] fact-finding hearing pursuant to RCW
> 13.34.110, it has been proven by a preponderance of the evidence that the
> child is dependent . . . and after a disposition hearing has been held
> pursuant to RCW 13.34.110, the court shall enter an order of disposition
> pursuant to this section.
> (1) The court shall order one of the following dispositions of the
> case:
> (a) Order a disposition that maintains the child in his or her
> home. . . .
> (b)(i) Order the child to be removed from his or her home and into
> the custody, control, and care of a relative or other suitable person, the
> department, or agency responsible for supervision of the child's placement.

RCW 13.34.130 does not expressly preclude a finding of active efforts during the

dependency fact-finding hearing.  Regardless, the court makes a disposition ruling, albeit

32

temporarily, at the shelter care hearing, which can be modified at any time. No statute specifically prevents the court from returning the child to the home immediately on conclusion of the dependency action. As the juvenile court recognized, if the court does not order a dependency, the children go home. By implication, the State seeks to continue the out-of-home placement at the dependency hearing.

As noted by the State, DCYF, under federal regulations, possesses no duty to take active efforts before removing a child from a parent's home. *In re Dependency of J.M.W.*, 199 Wn.2d 837, 847 (2022). Washington has not adopted similar regulations, and Washington state law provides stronger protections for families. *In re Dependency of J.M.W.*, 199 Wn.2d 837, 847 (2022). We interpret WICWA in light of its overriding legislative purpose: to avoid the breakup of Native families. *In re Dependency of J.M.W.*, 199 Wn.2d 837, 847 (2022). Also, the Bureau of Indian Affairs, despite the federal regulations, recommends the court "inquire about active efforts *at every court hearing* and *actively* monitor compliance with the active efforts requirement." BIA, U.S. DEP'T OF INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 43 (2016) (hereinafter BIA GUIDELINES) (emphasis added).

Washington statutes and case law emphasize the imperative of active efforts and encourages monitoring of active efforts by the juvenile court at every opportunity. The duty to engage in active efforts begins before removal of the children from their home.

33

*In re Dependency of A.T.*, 29 Wn. App. 2d 687 (2024). Once the State files a dependency action, the state agency must engage in active efforts to reunite the family if the children remain outside the home. *In re Dependency of G.J.A.*, 197 Wn.2d 868, 887 (2021). Key to "active efforts" is the department's duty to actively engage the parent in a thorough and timely manner to help reunify the Indian family. *In re Dependency of G.J.A.*, 197 Wn.2d 868, 873-75, 888, 891 (2021). DCYF must be consistent in its provision of active efforts throughout the dependency, and it is not relieved of its duty to provide active efforts simply because it made sufficient efforts at another time during the dependency. *In re Dependency of A.L.K.*, 196 Wn.2d 686, 704, 478 P.3d 63 (2020). The dependency court has the responsibility to evaluate active efforts at every dependency proceeding when the child is placed out of the home. RCW 13.38.040(1)(a)(ii). Any delay in adequately engaging the parent only accelerates the destruction of the Native family's cultural identity and ties to their community. *In re Dependency of G.J.A.*, 197 Wn.2d 868, 888 (2021).

We ruminate on reasons for demanding an adjudication of active efforts at every hearing, including the dependency hearing. The law wishes to rectify centuries of horrific treatment of Native Americans and the unjustified removal of Indian children from their family and their Native American nation. Even today, a bias lingers that leads to unduly high numbers of Native American children being removed from home and kept

from parents and their community. Therefore, the law demands continuous and extraordinary efforts before and after removing an Indian from his or her home and family. The court should monitor those extraordinary efforts at every opportunity. The Washington Supreme Court deems active efforts so important that it has held the futility doctrine, applied in almost all, if not all, other areas of the law, inapplicable in an Indian Child welfare proceeding. *In re Dependency of G.J.A.*, 197 Wn.2d 868, 903 (2021).

The mother's children's dependency proceeding suffered substantial delays as recognized by the juvenile court's apology to the mother. One hundred and thirty-five days elapsed from the removal of the children on September 30, 2022 and the disposition hearing on January 27, 2023. On September 30, the court entered a finding of active efforts. Nevertheless, during the 135-day delay, the children remained placed outside the home despite no additional finding by the juvenile court that DCYF continued to exert active efforts. The mother's disposition hearing occurred on January 27, 2023, 52 days after the last testimony in the dependency fact-finding hearing on December 6 and 45 days after the court's oral ruling of dependency on December 18.

The juvenile court signed the order of dependency on January 27, the day the disposition hearing commenced. Thus, the State may argue that the disposition hearing commenced immediately after the ending of the dependency hearing. But testimony ended on December 6, and the juvenile court issued its oral ruling on December 13. The

purpose of conducting the disposition hearing immediately after the dependency hearing is to hurry the process that concerns the well-being of children. By the end of testimony at the dependency hearing, 67 days had passed since the only finding of active efforts. By the oral announcement of the dependency ruling, 74 days had passed since the only finding of active efforts. By the time of the disposition hearing, 129 days had passed since the only finding of active efforts.

We address some anomalies found in this dependency proceeding. This appeal's circumstances include the mother, who opposed the dependency, being non-Indian, and the Indian father of the oldest two children declining to participate in this proceeding after never having engaged in fathering the children. To our knowledge, no Native American nation or Native American family seeks custody of the two children. Nevertheless, the terms of ICWA and WICWA apply when a child is Indian regardless of any lack of participation from the Indian parent or the parent's tribe. 25 U.S.C. § 1903(4); RCW 13.38.040(7). ICWA seeks in part to impart the unique values of Native American culture to each Indian child regardless of the participation of the Indian parent. *In re Jeremiah G.*, 172 Cal. App. 4th 1514, 1520, 92 Cal. Rptr. 3d 203 (2009).

The youngest child of the mother is non-Indian. Thus, ICWA and WICWA should not apply to R.R. No party, however, suggests in its or her brief that different rules apply to R.R.

REMEDY

The dependency court may impose a dependency on an Indian child without a finding of active efforts in limited circumstances. Since the State must exert active efforts only to justify out-of-home placement, the court may order a dependency with the child residing at home. Alternatively, the court may order an out-of-home dependency if DCYF shows that return home "would subject the children to substantial and immediate danger or threat of danger." 25 U.S.C. § 1920; RCW 13.38.160; *In re Dependency of A.L.K.*, 196 Wn.2d 686, 690-91, 703 (2020).

After the disposition hearing, the trial court entered finding of facts U and W, which declared that DCYF engaged in active efforts. In addition, the court entered finding of fact Q, which reads "The children are at imminent risk of physical damage or harm and substantial and immediate danger or threat of such danger should they be returned to [the mother's] care." One might argue that these findings rectify the failure of the trial court to decide, at the dependency hearing, whether DCYF exerted active efforts because it later entered such a finding. Also, based on finding of fact Q, the children could not be returned home regardless of active efforts.

We disagree with these arguments. A substantial delay occurred between the ending of the dependency hearing and the disposition hearing. A late finding thwarts the goal of constant monitoring by the court of active efforts. If the court had reviewed

37

active efforts at the dependency hearing and found the efforts wanting, DCYF may have

then employed plentiful, if not unending, efforts to reunite the family by the time of the

disposition hearing such that returning the children home would not have endangered or

threatened to endanger the children's safety.

Because of the importance of continuing active efforts, we could remand for the

trial court to reconstruct whether or not DCYF had expended active efforts as of

December 6, the last day of the dependency hearing. But such a reconstruction would be

difficult, if not impossible, because of the passage of time. The court will not order an

impractical or unworkable remedy. *Dix v. ICT Grp., Inc.*, 160 Wn.2d 826, 840 n.8, 161

P.3d 1016 (2007); *Northwest Animal Rights Network v. State*, 158 Wn. App. 237, 244

n.6, 242 P.3d 891 (2010); *Proctor v. Huntington*, 146 Wn. App. 836, 851, 192 P.3d 958

(2008), *aff'd,* 169 Wn.2d 491, 238 P.3d 1117 (2010). Nevertheless, because the

dependency will continue on remand, we direct the trial court to promptly review again

DCYF's efforts and determine whether the efforts pass muster as active efforts under

ICWA and WICWA.

The mother challenges the sufficiency of evidence to support a finding of danger

to her children. Because we direct the trial court, on remand, to promptly assess active

efforts, we also direct the court, if DCYF did not exert active efforts, to either return the

children to their home or conduct an evidentiary hearing and, based on the evidence, find

No. 39593-6-III (Anchor Case)
Consolidated: 39594-4-III, 39595-2-III
*In re the Welfare of: C.J.J.I.*

that return to the home would subject the children to substantial and immediate danger or

threat of such danger.

CONCLUSION

We remand to the superior court for further action in the dependency proceeding.

The trial court shall, within ten days of the issuance of our mandate, again address

whether DCYF has engaged in active efforts. If DCYF has not, the court should either

return the children to their home or enter a finding of a substantial and immediate danger

or risk of danger to the children if returned home.

_____
Fearing, J.

WE CONCUR:

_____     _____
Pennell, J.                          Staab, A.C.J.

39

APPENDIX A

24. On May 18, 2022, DCYF received another intake, submitted by Greenacres Middle School. This report was made the day after one of the boys had "run off." [The mother] blamed [C.V.I.] and tried to "fist fight" her. After the fight, [C.V.I.]'s hips, back, arm, and leg hurt. [C.V.I.] also relayed that she constantly cooks, cleans, and takes care of her younger brothers while [the mother] is with her boyfriend. [C.V.I.] was fearful of her mother's boyfriend, who she reported carries a firearm. (See Exhibit P6).

25. Social Worker Rose spoke with [C.V.I.] after this intake and confirmed [C.V.I.]'s statements to Greenacres. In addition, she learned of [the mother]' physical discipline of and a resulting bruise to [R.R.]. Another intake was generated based on [C.V.I.]'s report. There was no credible evidence that the intake was based on a vendetta against Ms. Mother.

. . . .

27. DCYF received several more intakes regarding [the mother] within the span of a month. There was no credible evidence that any of these intakes were based on a vendetta against [the mother].

a. On May 24, 2022, Greenacres Elementary School reported [C.J.J.I.] walked to Walmart alone with another child. The report also detailed that [C.J.J.I.] reported he consumed alcohol to go to sleep (See Exhibit P3).

b. On May 26, 2022, school was released in the afternoon at 3:15 p.m. [C.J.J.I.] was not able to ride the bus home from school due to his inappropriate behavior. The school called [the mother] several times to pick him up but was unable to reach her. [C.V.I.] came to attempt to pick [C.J.J.I.] up from school but was unable due to her being a minor. Another adult Esther Miller, came to pick up [C.J.J.I.], but was not previously approved for pick-up. Ms. Miller later returned with [the mother] to pick [C.J.J.I.] up, around 5:30 p.m. School staff observed [the mother] had marks on her arm and was hard to follow in conversation.

c. On June 2, 2022, Greenacres Elementary School reported [C.J.J.I.] was not staying in his home at night, that his mother had not been home, that he was not being fed dinner, that he was not being adequately supervised, and was not given his medicine (See Exhibit P4).

d. On June 3, 2022, Greenacres Elementary School reported [C.J.J.I.] arrived home and the doors were locked, that he found another family to stay with, had no dinner, and could not recall the last time he had seen his mother (See Exhibit P5).

. . . .

40. [The mother] sometimes left the children alone at night after they went to sleep and would spend the night with her boyfriend at another location. During some of these nights, [C.V.I.] would also leave, leaving [C.J.J.I.] and [R.R.] alone and unsure of who was in charge of them. The children would occasionally come to their neighbors' homes in the early morning, unsure of where their mother had gone. [The mother] prioritized her relationship with her boyfriend above her responsibilities to her children.

. . . .

42. During the spring and summer of 2022, Social Worker Rose continued her efforts to contact [the mother] by phone and text message, visit the home, and try to locate her in other locations, offer her community resources, request that she provide a UA test, offer her a ride to UA testing, and work to ensure the children had appropriate supervision. [The mother] was not receptive to these efforts and stated none of the Department's concerns were valid and that she did not want any assistance from the Department.

43. During this time, the Department scheduled several Family Team Decision Meetings (FTDMs) and also reached out to coordinate with the Cheyenne River Sioux Tribe. The Tribe indicated they would not be involved unless court process began. [The mother] participated in two FTDMs and did not appear at or participate in the others.

44. Social Worker Rose also continued to investigate intakes, including speaking to the children and other collaterals. . . .

45. The children were enrolled in childcare at the MLK Community Center, but only attended five days between July and August 2022. The State paid for the childcare. [The mother] was provided the opportunity for safe, supervised care of her children, and chose not to continue it.

. . . .

67. On September 16, 2022, the court granted the Department's requested pick-up order for [R.R.] and [C.J.J.I.]. The order was executed after the school day. The elementary school principal, Ms. Kent, testified that [C.J.J.I.] was very upset and clearly understood the implications of

what was happening. [The mother] came to the boys' school that afternoon to assist in getting [C.J.J.I.] into the transport vehicle. [The mother] told [C.J.J.I.], "You good bro? You good? We talked about this." [The mother's] comments to [C.J.J.I.] ~~indicate she has contemplated and spoken to her children about the possibility of their removal from her care. Ms. Mother' comments to [C.J.J.I.] also~~ display a lack of sensitivity to his emotional response to that stressful situation

. . . .

71 Mattie Keller was assigned as the ongoing DCYF social worker and began working with the family after the initial shelter care hearing. . . .

. . . .

77. DCYF referred [the mother] for Intensive Family Preservation Services (IFPS) after the children were returned to [the mother] at the shelter care hearing. Angela Van Grimbergen received the referral and began working with [the mother] on September 28, 2022. *[The mother] told Ms. Van Grimbergen she believed the Department's requests of her were ridiculous and that her use of cocaine was one-time and not a cause for concern.* [The mother] refused to allow social worker Keller to take an oral swab sample to test for substance use. . . .

. . . .

79. [C.V.I.] disclosed to Ms. Rose that since being home, she had observed [the mother] hitting [C.J.J.I.] and stating to him, "If you don't shut the fuck up, I'll beat the shit out of you." This report generated another intake. (Hearsay evidence admitted for basis for intake not for the truth of the matter asserted.)

. . . .

84. [The mother] spoke to Ms. Van Grimbergen after the hearing and over the weekend. Ms. Van Grimbergen encouraged [the mother] to stay sober. With encouragement from DCYF, Ms. Van Grimbergen kept working with [the mother] through October 6, 2022, despite the children having been removed from the home.

. . . .

95. SPARC [Spokane Addiction Recovery Center] had availability for [the mother] to begin outpatient treatment within two days and would have been able to have a mental health assessment within a week. SPARC also offers EMDR (eye movement desensitization and reprocessing) treatment, which [the mother] testified was something she wanted to pursue.

. . . .

97. [The mother] did not follow the SPARC recommendations and instead pursued an intake with New Horizons. [The mother] testified that she did not feel comfortable working with SPARC and wanted to go somewhere closer to her home and which offered EMDR.

98. DCYF scheduled a mental health assessment for [the mother] with Phoenix Counseling Services. [The mother] attended this assessment, but the appointment ended abruptly when [the mother] declined to sign releases of information.

. . . .

101. Since the children have been out of home, DCYF has had challenges in establishing regular visitation for [the mother], due to her prior history with various agencies, agencies declining visits due to safety concerns they have experienced with the family, and the chaotic nature of the visits, which require two visitation supervisors.

102. DCYF supervised several visits to ensure continued contact between [the mother] and her children while it sought a regular visitation provider. Social worker Keller observed [the mother] to have difficulty meeting the children's physical and emotional needs during these visits.

. . . .

109. [The mother] is seeking other opinions to avoid engaging in recommended chemical dependency treatment as she lacks insight into her need for this treatment.

. . . .

116. Ms. Keller attempted to safety plan with [the mother] regarding her relationship with Mr. Nason. [The mother] dismissed the attempts because Mr. Nason is incarcerated and she reports they are no longer in a relationship. Despite [the mother's] report that she is no longer in a relationship with Mr. Nason, for much of the trial, Mr. Nason's mother, Cheryl Harty, was present in the court room as a support for [the mother]. [The mother] reported physical violence to the Department, but because the children were not present, that was not a problem.

. . . .

137. *The children currently do not have a parent, guardian, or custodian capable of adequately caring for them, such that they are in circumstances which constitute a danger of substantial damage to their psychological or physical development.*

43

CP at 975-88 (emphasis added).

APPENDIX B

[Finding of fact V]

a. The Department previously offered services to [the mother] through a four year dependency case. [The mother] completed mental health assessments, chemical dependency assessments, and parenting assessments. [The mother] was offered therapy and treatment, as well as in home parenting support. [The mother] participated in the WISE program for [C.J.J.I.]. [The mother] participated in triple P parenting, intensive family preservation services, and family therapy.

b. During the recent investigation, the Department researched a number of collateral sources and interviewed those sources to have the best information possible on how to assist the family and the barriers faced. Social worker reviewed Famlink records, as well as other collateral records available to SW—WHALES, LE reports, Barcode/ACES, court viewer—in attempts to gather additional information as to parents to adequately assess. The Department met with the children and [the mother] on a number of occasions to assess needs, barriers, and attempt to successfully engage [the mother]. Social worker was unable to complete a fully comprehensive assessment due to [the mother]' repeated unwillingness to engage. Social worker made ongoing efforts to interview and assess needs of the children. [C.V.I.], [C.J.J.I.] and [R.R.] were interviewed at school on multiple occasions. Social Worker pursued collaterals (school/medical/dental) in an attempt to further assess the children's needs. Social worker contacted collaterals identified, including housing case manager, school counselor and staff, identified social supports, neighbors, and other collaterals identified from Famlink history. Social worker completed additional searches in Barcode, ACES, court viewer, and Facebook for parents and possible relatives/supports. The Department conducted a relative search and made relative contacts in attempts to identify additional family information supports and possible placement options. Family contacted either were not willing or not safe or appropriate for placement. Messaged relatives identified in Facebook. The Tribe has also assisted in identifying relatives. The Department also attempted contact with the fathers of the children, [R.R], Sr. and [B.I.], who are not involved in their children's lives and were not responsive to Department efforts to locate and engage them. Social worker requested parent locator in attempts to locate [R.R.] and [B.I.] and followed leads by going to possible homes in attempt to contact

parents and locate family. The Department discussed community-based services including culturally competent services and provided [the mother] with written information on services, to include Safe Families, WISE, the Vanessa Behan Nursery, Native Project, and American Indian Culture Center. Social worker provided CD treatment resources provided for YFA connections, American Indian Community Center, American Behavioral Health Systems, New Horizon Outpatient, and Compassionate Addiction Treatment. Housing resources provided including: Eviction Resolution Pilot Program, NW Mediation, Volunteer Lawyers Program, Safe Families, Vanessa Behan. The family had been involved with the Native Project, however, [the mother] refused the request to sign a release of information so the Department could assess. The Department also offered hard copy information on services to [the mother's] apartment manager to provide to [the mother] at a time when she may be more receptive. [The mother] consistently denied the need for Department support and resources. Social worker discussed chemical dependency and domestic violence services with [the mother]. [The mother] denied a problem and reported no need for services. Social worker completed a comprehensive domestic violence assessment based on collateral information gathered, police reports, and child interviews. Domestic violence resources were offered to [the mother] due to the significant concerns in the home. [The mother] initially denied the domestic violence in the home and refused services. Nevertheless, the Department persisted in attempting to engage [the mother], by attempting to contact her through announced and unannounced visits to the home, phone calls, text messages, emails, social media contacts, and letters in the mail. The Department continued to offer UAs and offered to drive [the mother] to the UA testing. The Department discussed the importance of storing substances out of reach of children and offered a lockbox to [the mother], which she declined. Social worker also continued to address the children's wellbeing with [the mother], requesting she update her children's medical and engage in a WISE referral made by school staff. This social worker tailored her approach to working with [the mother], communicating in a calm, respectful manner, attempting to understand [the mother's] perspective and needs, and attempting to deescalate [the mother] when necessary. The Department organized and held four FTDMs, to attempt to problem solve with the family and identify solutions. The Department worked with [C.V.I.] on a CHINS petition prior to her testimony that she was in the home. The Department was aware of the tribal affiliation on

46

these matters and reached out to update and engage the Cheyenne River Sioux Tribe during its investigation. The Tribe indicated it would only become involved if there was court involvement. The Department respected that guidance and informed the Tribe when it was moving toward filing dependency petitions and has consistently worked with the Tribe since.

[Finding of Fact W]

a. The Department has worked diligently and actively, devoting significant time and resources and maintaining frequent communication with [the mother]. DCYF attempted to support and sustain [the mother's] care of the children when they were returned to her care on 9/20/22 through providing intensive family preservation services, and extending that service beyond when it is designed to close after the children were removed on 9/30/22. DCYF has made timely referrals for all court ordered and recommended services, including providing resources for culturally competent services and attempted to problem solve with [the mother] as she identifies barriers or resistance to those services, including offering oral swab when [the mother] would not UA and supporting participation in virtual services to address transportation concerns. DCYF has consistently engaged [the mother] in person, including at [the mother's] home, by phone, by text message, and provided hard copy information about services and resources as well. DCYF has provided [the mother] with a lockbox, gas cards, grocery card, and worked to reinstate financial supports for [the mother]. DCYF scheduled appointments for [the mother] until she expressed disagreement and her preference that the Dept not assist in that way. DCYF has provided appointment reminders to [the mother], provided transportation for the children to maintain educational stability, and provided professional lice services for [C.V.I.]. DCYF has continued to pursue completed releases of information and follow up with providers [the mother] has indicated she would prefer to obtain information and availability. DCYF has continued to spend significant time with the children to best address their needs, has made referrals for clothing vouchers, and is in regular contact with educators and other collateral sources to ensure their needs are being met.

b. SW has continued to contact and try to engage [the mother] despite her stated and demonstrated resistance. SW has encouraged [the mother] to become engaged in services and tried to offer solutions to the barriers [the mother] identifies. To reduce transportation barriers to engage

in her services due to [the mother's] reports of her vehicle not being drivable, SW has offered bus passes and routes and provided monthly gas cards to [the mother]. SW also offered [the mother] a ride to a job interview to allow her to attend an FTDM regarding placement of [C.V.I.] ([the mother] declined). On 12/23/2022, the Department paid [the mother's] past due phone bill through the month of January in order for her to maintain communication for visitation, services, and with this SW. SW has called UGM Motors to ask about car repair and tires for [the mother's] vehicle as she has indicated the condition of her vehicle to be a barrier at times. SW has called chemical dependency agencies including Sequoia Detox Center, Royal Life Centers, Spokane Falls Recovery, and Riverside Recovery, to check on virtual treatment availability so [the mother] could start engaging in services. SW has maintained consistent contact with the children's schools, drove to pick up [C.V.I.]'s backpack from placement to bring to her at school, and called Lutheran Community Services to get [C.V.I.], [C.J.J.I.], and [R.R.] screened for WISE services at a trauma-informed agency. All three children have screened-in for WISE services. SW has also continued to keep [the mother] informed of any upcoming appointments for the children so she may attend. The Department has worked to ensure consistent visitation making multiple referrals including emergent referrals and providing supervised visits itself as a gap measure. The Department also continues to keep the Tribe informed of the status of the case and invites and involves the Tribe in case planning to actively collaborate.

X. It is contrary to the children's best welfare to return home. The children should be placed or remain in the custody, control, and care of DCYF because:

[X] There is no parent or guardian available to care for such child; or

[ ] The parent or guardian is not willing to take custody of the child; or

[X] A manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44.063 would not protect the child from danger.

CP at 1315-18.

48